UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 12-11351-GAO

DENISE WOOLF, DARREN WOOLF,
and DARREN M. WOOLF,
Plaintiffs,

v.

UNITED STATES OF AMERICA,
Defendant.

FINDINGS OF FACT, CONCLUSIONS OF LAW,
AND ORDER FOR JUDGMENT
September 28, 2016

O'TOOLE, D.J.

The plaintiffs, Darren M. Woolf ("Darren" or "Darren Jr."), Darren Woolf ("Darren Sr."), and Denise Woolf ("Denise"),[1] brought this suit against the United States of America pursuant to the Federal Tort Claims Act ("FTCA") for damages resulting from an injury to Darren Jr. that occurred at an event organized by the U.S. Army National Guard. The Court conducted a five-day bench trial on Darren Jr.'s personal injury negligence claim (Count I) and his parents' derivative claims for loss of consortium, emotional distress, and care and support (Counts II and III for Denise and Darren Sr., respectively). After the trial, the parties submitted proposed findings of fact and conclusions of law and presented closing arguments. Having considered the evidence and arguments of the parties, the Court now finds and concludes as follows.

---

[1] For convenience throughout the trial, plaintiffs' counsel referred to the younger Darren as "Darren Jr." and his father as "Darren Sr.," even though father and son do not typically go by "Junior" and "Senior." I use the same designation for convenience as well, though I will often refer to Darren Jr. simply as Darren when the context is clear.

**I.**     <u>**Findings of Fact**</u>

Darren Sr. is a Sergeant, First Class, with the U.S. Army National Guard, and served at the relevant time in the 181st Engineering Company based at Camp Edwards, Cape Cod, Massachusetts. On August 2, 2009, the 181st held a "Family Day" event at Camp Edwards. Members of the 181st were required to attend and were paid for their time. The event was designed to boost morale among the Guard members and their families. It was designed as a relatively informal, unstructured setting where soldiers and their families could mingle and socialize, an objective being to develop a more cohesive unit.

The family day had been planned in advance by Captain Russell T. O'Neill and First Sergeant Keith Hathaway. It included a cookout, an information station for the Family Readiness Group, and an organized softball game pitting the officers and non-commissioned officers ("NCOs") against enlisted soldiers.

The 181st has a hierarchical military structure of officers and enlisted soldiers. The Commander of the unit at the time was Captain O'Neill. He generally oversaw planning for the family day event, but he did not attend. First Sergeant Hathaway, who reported directly to O'Neill, attended and generally supervised the activities at the event. Hathaway was the highest ranking NCO present at the family day.

The company's Family Readiness Group consisted of soldiers' family members. Its purpose was to provide support and assistance to the families of soldiers who were away from home on deployment. Denise was the chair of the Family Readiness Group.

Darren Sr. attended the family day event as required, along with Denise, Darren Jr., and their daughter. Darren Jr.'s older brother, who was also a member of the 181st, also attended, but

apparently was not involved in the events at issue. Denise spent much of the day manning the Family Readiness Group table.

The family day events took place in and around an outdoor softball field. According to a photograph in evidence, the field was generally enclosed by a chain link fence. There was a break in the fence, serving as an entryway to the field, approximately halfway between home plate and third base. Behind that opening was a bench, serving as a sort of dugout, and a set of bleachers. Beyond was a concrete pad where the family readiness table, along with the food from the cookout, was set up, facing away from the softball field and towards a parking lot located a few feet further out.

Toward the later afternoon, an informal softball game was started on the field. Unlike the organized officers versus enlisted soldiers game held earlier, the evidence strongly suggests that this was a pick-up game among those who wanted to play. Hathaway recalled some soldiers wanting to play another game as the day was winding down. Hathaway testified that he stayed and watched that game. As the game was under way, Dean Meehan, another soldier in the 181st, approached both Darren Sr. and Denise to ask if he could take Darren Jr. to play in the game. Both parents agreed, and Darren went with Meehan to join the game. Neither Darren Sr. nor Denise watched the game, nor saw their son until after the accident.

The testimony was inconsistent as to whether Darren was the only young person to participate in softball activities. On the one hand, Hathaway did not recall any young persons or children other than Darren Jr. being present on the field. On the other hand, Private Randy Nogueira, who was catching in the pick-up game, recalled children being allowed a chance at bat and that they lined up against the fence to wait their turns to do so. No witness was able to put this in any coherent chronological sequence.

The specific facts leading up to Darren's injury are somewhat clearer. Toward the end of the day, Hathaway was standing inside the fence, off the third base line. Darren Jr. was near Hathaway, only a few feet away, also inside the fence, and also off the third base line.

As noted, Nogueira was playing catcher. A batter hit a ball into the outfield. The outfielder fielded the ball and threw it toward Nogueira in an attempt to put out a runner who was heading to home plate. The ball was overthrown and bounced to the backstop, where Nogueira went to retrieve it. The player who had hit the ball into the outfield was running the bases. Either he or another runner was approaching third base. Darren was moving toward the third base line. Standing along the third base line, Hathaway yelled, "The play is to third."

As the catcher Nogueira moved to get the ball at the backstop, he saw Darren walking toward home plate. Hathaway also recalled seeing Darren walk past him and bend down as if to pick up a bat.

Nogueira retrieved the ball, and believing that Darren would stop his approach toward the field, immediately turned and threw the ball toward third base. The thrown ball struck Darren on the side of the head, and Darren immediately dropped to the ground. The throw was not wild; it moved from Nogueira's position behind the plate in the direction of third base. The precise locations of Nogueira, Hathaway, and Darren Jr. cannot be determined from the evidence. Nogueira was left-handed, and it is likely that he retrieved the ball at the backstop somewhat to the left of the third base line extended past home plate and that the path of his throw to third base was also somewhat to the left and outside the third base line, which was where Darren was situated.

Darren's parents quickly learned of the accident and rushed to his side. Darren Jr. was unable to speak, and remained on the ground until an ambulance arrived. Denise traveled in the

ambulance with her son first to a local hospital, and then to Tufts New England Medical Center in Boston.

It is undisputed that Darren Jr. suffered from a closed head injury on the right side of his head. It can be described as a "Ping-Pong" injury, with the brain bending slightly inward and then popping back outward. He suffered an intracranial hemorrhage, hemisphere swelling, a severe concussion, and brain bruising. His injury led to bleeding within his brain that caused damage to his brain cells, resulting in the destruction of a two-centimeter-wide area located in the sensory strip of the brain.

The region of the sensory strip that was damaged corresponds specifically to sensation in the left hand, which is Darren's major hand. It is now constantly numb. This damage is permanent and cannot be rehabilitated. This injury causes Darren difficulties with activities requiring left hand dexterity.

His injury also caused Darren to have seizures. His first seizure occurred while still on the ground at the softball field; his eyes rolled back and he was for a short time unable to move or respond. Darren had several seizures in the first months and years following his injury. He would feel odd, become nonresponsive, and stare into space. He required anti-seizure medication. For a while he had the assistance of a service dog, trained to anticipate the onset of seizure activity. In addition, for a time he was required to have immediately available, including while at school, some additional medication to be administered in the case of particularly severe or extended seizure activity. This medication was never needed, but the nature of the medication (it was delivered by rectal suppository) and necessity of having it always at hand caused Darren increased anxiety. In recent years, Darren's seizures have subsided, but he remains at lifelong risk for a recurrence of seizures.

Darren's injury also resulted in increased fatigue and exhaustion. After the injury, after returning home from school he would immediately nap, often for several hours, rather than spend time with friends or in activities. Darren's treating psychotherapist, Julia Swartz, a clinical social worker, recommended that if Darren were to begin community college, he should start with only one or two classes until his stamina had been rebuilt.

After the accident, Darren also experienced severe migraine headaches. They came very frequently shortly after the accident, sometimes on multiple occasions per week. More recently, their frequency has diminished to a rate of perhaps a couple of occasions per month. These headaches occur more frequently when Darren concentrates intently, such as with schoolwork. He continues to have difficulty in performing work that requires intense concentration.

Additionally, Darren has some cognitive deficits as a result of the injury. He has some difficulty with short-term memory, such as remembering specific tasks he has been told to complete. Dr. Ekkehard M. Kasper, a neurosurgeon, described the area of the brain that was injured as one which "carries out complex tasks which influence various constructional skills as well as abstract thinking . . . which has compromised his memory, concentration and sustained attention capabilities." (Ex. 15, at 16.) Dr. Steffen Fuller, a doctor of clinical psychology, described Darren as having mild cognitive impairments. Personality testing performed by Dr. Fuller indicated that Darren "struggles with memory challenges and concentration problems and often feels withdrawn from others." (Ex. 14, at 8.)

Darren sometimes has trouble finding the right words, described by Dr. Fuller as a "tip of the tongue" problem. This phenomenon seemed to occur several times during his testimony at trial. It could also be seen in the video recording of Darren's examination by Dr. Fuller.

Swartz diagnosed Darren with post-traumatic stress disorder and adjustment disorder with anxiety, both directly related to the accident. Dr. Fuller's testing was consistent with these diagnoses and indicated that Darren experiences above average amounts of depression and anxiety. The anxiety and distress he feels can feed his cognitive deficits, which can cycle back, further increasing anxiety. Since his accident, Darren has become less extroverted and more moody.

The physical injuries are likely permanent, and Darren will likely require lifelong psychological assessment and treatment.

Darren's risk of seizures excludes him from a number of career opportunities. Prior to his injury, he had desires of joining the military, like his father and brother, and potentially becoming a firefighter or police officer. It was the consensus of medical and vocational witnesses that those careers are closed to him now. His social and anxiety issues likely limit his opportunities as well, such as for professions requiring effective, fast-paced communication and interaction.

His parents, Denise and Darren Sr., have also suffered emotional distress and hardship as a result of Darren Jr.'s injury. In the immediate aftermath of the accident, they both feared that they might lose their son. Denise was with Darren during both ambulance rides the day of the injury. The added burden of checking on Darren and taking him to medical appointments fell particularly to Denise as primary caregiver. Neither parent got much sleep in those first months after the accident. Darren Sr. saw his wife Denise break down in tears frequently for months after the accident. Denise also began seeing Swartz, Darren Jr.'s psychotherapist, for counseling. Denise testified that the accident and its subsequent effect on their lives had been "overwhelming." (Ex. 11, at 35–36.) Swartz opined about the emotional impact of the accident:

> The tragic accident . . . will forever be imprinted on Darren and the Woolf family. They have all suffered emotionally, psychologically and spiritually. Mr. and Mrs. Woolf easily come to tears when they reflect on this time in their lives and the unknown impact the accident will have on Darren's future.

(Id. at 37.)

Denise also supported Darren Jr. emotionally through this difficult period, trying to offer comfort as best she could. She would also try to anticipate and defuse situations that might cause Darren unnecessary stress or embarrassment, such as by limiting discussion of Darren's siblings' successes, or by creating (often surreptitiously) accommodations for school, activities, and work. Darren's parents eventually allowed Darren to begin playing sports again, despite obvious hesitancy about exacerbating his injury. Denise saw something of a breakthrough in Darren when sports reentered his life, and allowed him to pursue it.

Darren and his father have a good relationship, but after the accident, they could no longer engage in the same activities, and Darren Sr. would try to change what they did to accommodate Darren Jr.'s new physical and cognitive issues. Both parents have undergone significant emotional stress as a direct result of Darren's injury and its aftermath.

## II.    Conclusions of Law

This is an action under the Federal Tort Claims Act ("FTCA"), which provides that the United States shall be liable in tort "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C § 2674. The FTCA is the exclusive remedy for negligent acts committed by government employees acting within the scope of their employment. Id. § 2679(b). Because the accident occurred in Massachusetts, Massachusetts substantive law applies. See Davric Maine Corp. v. U.S. Postal Serv., 238 F.3d 58, 66 (1st Cir. 2001); Goldman v. United States, 790 F.2d 181, 183 (1st Cir. 1986).

I find specifically that the service members at the family day event (including Nogueira and Hathaway) were acting in the course and scope of their employment while present and participating in the event. Under Massachusetts law, whether the acts in this case are within the

scope of employment depends on three factors: (1) whether the act "is of the kind [the agent] is employed to perform," (2) whether "it occurs substantially within the authorized time and space limits," and (3) whether "it is motivated, at least in part, by a purpose to serve the employer." Burroughs v. Commonwealth, 673 N.E.2d 1217, 1219 (Mass. 1996) (citation omitted). The undisputed evidence produced at trial showed that the members of the 181st at the family day were required to be there, were being paid for their time, and were serving the needs of their employer (the National Guard) in participating in the morale building activity.

Darren's personal injury claim requires that he prove by a preponderance of the evidence the familiar elements of a cause of action for negligence: (1) the existence of a duty of care, (2) breach of that duty, and (3) a causal relationship between the breach and a resulting compensable injury in fact. See Fithian v. Reed, 204 F.3d 306, 308 (1st Cir. 2000). That Darren was injured and that that injury was caused by a softball thrown by a National Guardsman in the course of the family day event are undisputed.[2]

The plaintiffs offer four theories of liability: (1) Nogueira acted negligently (or recklessly—more about that below) in throwing the softball to third base without noticing the danger to Darren, (2) Hathaway (and other soldiers) were negligent in allowing Darren onto the field during active play, (3) helmets should have been provided to players (with the implication that Darren should have been wearing one), and (4) the organizers of the family day (including

---

[2] The government briefly argues in its proposed findings that there is no proximate cause because it was unforeseeable that Darren would walk onto the field. Under Massachusetts law, the plaintiff need only show "that a harm of the same general character was a foreseeable result of the defendant's conduct." Jorgensen v. Mass. Port Auth., 905 F.2d 515, 523 (1st Cir. 1990). It is reasonably foreseeable that allowing a young person onto a softball field places him at risk of being hit by softball.

Captain O'Neill) were negligent in not properly planning for having a softball game with young people and children playing.

The latter two theories can be rejected without much discussion, and for the same general reason: both theories presume that the softball game was a far more formal and organized event than the evidence showed it was.[3] The softball game in which Darren was injured appears to have been a more or less spontaneous pick-up game rather than a planned and organized sporting event (although certainly one that could have been anticipated at a family day outing). As to the absence of helmets, the theory was too undeveloped. The plaintiffs did not show why a reasonable person might expect helmets to be provided for a pick-up game at a family barbeque like the one that occurred in this case. Similarly, the plaintiffs did not show that allowing at all a pick-up softball game involving both adults and children (especially teenage children) was in and of itself unreasonably dangerous and thus culpably negligent.

Evaluating liability for Nogueira's and Hathaway's conduct requires a discussion of the proper standard of care, and it is different for each of them. For Nogueira, liability is alleged on the basis of his having thrown the softball to third base without taking adequate care to avoid harming someone else on the field, in particular Darren. Under Massachusetts law, the standard of care in that context is clear: "[P]ersonal injury cases arising out of an athletic event must be predicated on reckless disregard of safety." Gauvin v. Clark, 537 N.E.2d 94, 97 (Mass. 1989) (citing Restatement (Second) of Torts § 500) (applying a negligence standard to actions in the course of an athletic competition would chill players from participating vigorously in the game);

---

[3] Indeed, there was a contradiction in the plaintiffs' arguments about the game. On the one hand they argue that Captain O'Neill, for example, was at fault for not more meticulously planning for the safety of an anticipated pickup game while, on the other hand, arguing that soldiers on site should have prevented a pickup game from happening at all.

see also Gray v. Giroux, 730 N.E.2d 338, 340–41 (Mass. App. Ct. 2000). Recklessness in this context involves "a degree of risk and a voluntary taking of that risk so marked that, compared to negligence, there is not just a difference in degree but also a difference in kind." Gray, 730 N.E.2d at 341 (quoting Sandler v. Commonwealth, 644 N.E.2d 641, 644 (Mass. 1995)). .

The evidence presented at trial did not establish that Nogueira acted recklessly in throwing the baseball to third base during play in the game. The evidence did not show, for example, that Nogueira voluntarily chose to expose Darren to a risk of substantial harm. The best conclusion from the evidence is that Nogueira was simply trying to play competitively, if over-enthusiastically. That does not reach the recklessness standard.

In contrast, Hathaway's potential liability is based not on his participation as a player in an athletic event, but rather on his overall responsibility, as the senior officer on site at the family day event, to avoid exposing attendees to foreseeable and unreasonable risks of harm. In other words, the theory of liability asserted against Hathaway is the familiar one of premises liability: a person in control of premises has a duty to avoid exposing persons on those premises from an unreasonable risk of harm. Dos Santos v. Coleta, 987 N.E.2d 1187, 1192 (Mass. 2013) ("An owner or possessor of land owes a common-law duty of reasonable care to all persons lawfully on the premises."). The applicable standard of care is simple negligence. Id. By reason of his supervisory responsibilities, Hathaway specifically had a duty to protect Darren (and others similarly situated) from foreseeable risks of harm.

On the evidence, I find that Hathaway was negligent in not preventing Darren from wandering into the field of play and thus exposing himself to an errant throw from Nogueira toward third base. It is true that the exact details of the play are uncertain: who was positioned where, how far Darren and Hathaway were from the third base line, where Nogueira was when he threw the

ball, etc. Nonetheless, Hathaway, only a few feet away, saw an emergent and dangerous situation as Darren walked towards the third base line just as play on the field centered on that location, a fact that Hathaway was clearly aware of. (He shouted, "The play is to third.") The evidence indicated that Hathaway may have been more interested in the game than in the safety of bystanders, which was his responsibility. He was the senior soldier on the field, and he had the authority and duty to act if a dangerous risk arose. By allowing Darren to walk past him towards an active play, while remaining more focused on the play itself, Hathaway negligently allowed Darren to be exposed to the hazard of physical injury, and that hazard resulted in actual injury.

The government raises contributory negligence as a defense to its liability. In Massachusetts, contributory negligence bars recovery if the plaintiff's negligence is greater than that of every defendant, otherwise the damage award is reduced in proportion to the plaintiff's negligence. See M.G.L. ch. 231, § 85. Here, the government, as organizer and runner of the event, through the supervising adult, Hathaway, bears the greater share of negligence when compared to Darren. Darren was a thirteen-year-old boy who, though the evidence is uncertain, may have been trying to pick up a bat on the side of the field. Darren should have been aware of some danger and should have been more careful, but a child "is to be judged by the standard of behavior expected from a child of like age, intelligence, and experience." Mann v. Cook, 190 N.E.2d 676, 679 (Mass. 1963); see also Restatement (Second) of Torts § 283A. I conclude that a boy of Darren's age, intelligence, and experience should have been aware of some of the danger during a live play, but could reasonably have relied in large part on the supervising adults around him. I find that Darren was negligent, and that his negligence amounted to twenty percent (20%) of all the negligence leading to his injury. The government's negligence, accordingly, was eighty percent (80%). The evidence presented does not warrant a finding that Darren Sr. or Denise were contributorily

negligent—to the extent it applies to their own claims—in allowing Darren to go to the softball field.

Darren's parents also bring claims for loss of consortium with their child. See M.G.L. ch. 231, § 85X. For the period when Darren was dependent on his parents, they may claim damages to the extent "their lives have been significantly restructured and their expectations of enjoying those experiences normally shared by parents and children have been seriously impaired." Reckis v. Johnson & Johnson, 28 N.E.3d 445, 469–70 (Mass. 2015) (citation omitted).

Darren Sr.'s loss of consortium claim is not barred by the Feres doctrine. See Feres v. United States, 340 U.S. 135, 146 (1950) ("[T]he Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service.") The Feres doctrine has three broad rationales: (1) the distinctively federal character of the relationship between the government and its servicemembers, (2) the availability of alternative means of compensation for injuries, and (3) the possible effect of lawsuits on morale and discipline. See United States v. Johnson, 481 U.S. 681, 688–91 (1987). Here, unlike an injury that occurs in the course of military duty, there is no alternative compensation system available for Darren Sr.'s loss of consortium injury. Moreover, a loss of consortium claim is a derivative injury, rather than a claim for independent damages. It derives from the government's negligence not to one of its soldiers but to a non-servicemember. Thus, neither the issue of the federal nature of the relationship nor effects on discipline are implicated. Darren Sr. may recover for the damages he suffered as the father of his injured son.

The plaintiffs have requested damages for future medical expenses, lost earning capacity, pain and suffering, and loss of consortium. The parties have agreed that the plaintiffs do not seek

medical costs from the date of the injury through Darren Jr.'s twenty-first birthday, which costs were covered by government sponsored health insurance.

A.    Future Medical Expenses

Darren currently has psychotherapy sessions with Swartz twice per month to help with his post-traumatic stress disorder and adjustment disorder with anxiety. According to Swartz, the cost of an individual psychotherapy session is $175 per session, with an annual $250 reevaluation. Swartz testified that Darren will require these sessions for the rest of his life, though he may go through periods where he requires more or fewer sessions. The plaintiffs' economic expert, Dr. Dana Hewins, calculated that the net present value of the cost of future sessions at twice per month for the remainder of Darren's life expectancy, conservatively invested, came to $208,752. The government did not challenge that testimony, and I accept it.

Various expert witnesses and doctors have recommended that Darren enroll in cognitive training. Cognitive training could provide Darren with strategies to cope with his cognitive deficits. Dr. Fuller testified that the rate for a session with him would cost $245. The evidence produced was not clear on how long or how frequently Darren might need this therapy. As described, the therapy would provide coaching on how to deal with his current, permanent condition. Assuming one visit a month for a period of five years invested at a real interest rate of 1%, this therapy would cost approximately $14,000.

B.    Lost Earning Capacity

Prior to his accident, Darren had expressed interest in joining the military, followed by employment as a firefighter or a police officer. Those were realistic goals and expectations. Both vocational experts, Deborah Veatch and Dr. Amy Vercillo, agreed that Darren's opportunities have become more limited following his accident. For example, he should not be employed in an

occupation that risks additional head trauma, and he should not work at heights. The experts agreed that Darren will not be able to pursue a career in the military, and Veatch also testified that Darren will not be able to pursue a career in the police or fire fighting forces.

Generally, I find the plaintiffs' vocational expert credible. She conducted a review of Darren's medical and education records, his and his parents' depositions, and interviewed Darren with his mother for approximately three hours. She opined that, without the injury, Darren would have had the long-term earning capacity of a person at the 50th percentile of individuals with an associate's degree or equivalent.

Darren currently is not enrolled in community college. He has been resistant to starting community college courses, even one class at a time, in part because of the difficulty he had with high school studies after his injury.

Veatch opined that, without community college, Darren's earnings will likely be limited to the 25th percentile of earners with only a high school degree. Because of his lifelong risk of seizures, need to avoid future head injuries, and numbness in his left hand, he will likely not qualify for work in the higher paying trades at that education level. In addition, Darren would have difficulty working in an office setting that placed too many demands on him; such a position would be challenging with his memory problems, fatigue, and headaches from concentration.

At the time of trial Darren was successfully employed in a retail store. Depending on the right setting, this type of work is appropriate for him. Veatch also believed, as did Dr. Fuller, that Darren could successfully attain his associate's degree with time. Veatch opined that even if he did, considering the likely courses of study Darren might enter, Darren's earnings would still be limited to the 25th percentile of earners with an associate's degree.

Dr. Hewins (the economist) took Veatch's opinions as to Darren's earning capacity and translated them into a net present value loss. First, he calculated Darren's anticipated earnings had he not been injured. Statistics from the Census Bureau indicated that the 50th percentile starting salary for someone with Darren's demographic characteristics was approximately $27,000. Dr. Hewins then added twenty percent in fringe benefits. Dr. Hewins then calculated the length of Darren's expected work life, and he estimated raises throughout that work life. As Dr. Hewins explained, earnings rise at different rates throughout a worker's life, and his calculations took this variable rise into account for each year's expected earnings. Dr. Hewins calculated the net present value of these earnings, conservatively invested, net of expected taxes and after adjusting for some periods of involuntary unemployment, arriving at $1,645,712 expected lifetime earnings had Darren not been injured.

Dr. Hewins performed much the same calculation for Darren's actual expected earnings, this time assuming that he would enter the labor market at the 25th percentile of high school graduates, and remain there long term. This calculation yielded expected earnings approximately one-third lower than what he would have earned had he not been injured, or approximately $550,000 in lost earnings.

There is reason to believe this figure is a conservative estimate. Dr. Hewins's method assumes full-time employment, which is often not available for lower paying jobs. Darren's current employment is not full-time, for example. Dr. Hewins also testified that those with disabilities tend to participate in the labor force at lower rates and have shorter working lives. However, the degree of effect of these factors is uncertain, and so was not built into the $550,000 calculation.

Dr. Vercillo's testimony at trial did not speak to precisely the same issues as Veatch's. Dr. Vercillo discussed a number of professions that could be performed by someone with a high school

degree. She stated that the jobs listed were merely illustrative of what a person with that education could obtain, not what Darren himself might be able to perform. She also reported the mean earnings for all people employed in that occupation, rather than the entry-level figure Dr. Hewins used. Dr. Vercillo's numbers and the inputs used by Dr. Hewins are effectively apples and oranges; they cannot be directly compared. I find credible Veatch's testimony about how Darren's injury impacts the range of jobs he can perform, and how the impact on that range affects his overall earnings capacity.

Darren's work history confirms that he has a limitation in the range of jobs he can perform. He had to leave a previous retail job because of the loud noise and odd lighting in the store. He was terminated from a job at a print shop due to hand and memory issues. His potential for future work is credibly reduced, and Dr. Hewins's calculation conservatively estimates those lost wages. Even though Darren may in the future obtain an associate's degree, the other factors described by Dr. Hewins offset that possibility. The $550,000 figure is the best estimate of lost earnings.

C.    Pain and Suffering

Darren experienced pain and suffering in multiple ways from this injury. There was the initial pain and disorientation in being struck by the softball. In the immediate aftermath, Darren feared for his life and spent time in a hospital. After coming home, he experienced several seizures, frequent migraines, and was unable to engage in many of the school and recreational activities he had beforehand. Darren also experienced embarrassment and withdrew from social situations during his later teenage years because he perceived himself as different than his peers. His life was altered significantly by the injury, and he is keenly aware of that fact.

The seizures have apparently stopped, though he remains at elevated risk of their recurring, and the migraines have lessened in frequency, though he still has them. Other effects of the injury

are permanent: he struggles with memory issues, often has difficulty expressing himself, and is still fatigued easily. His left hand will remain numb for the rest of his life. Taking into consideration all these factors, I award $500,000 for past and future pain and suffering as a result of the injury.

> D.     Loss of Consortium

As discussed above, Darren's parents faced a difficult time following their son's injury. Their injury is mostly one of the past, in the difficult days and months following his injury. Denise appears to have borne the greater share of the emotional toll caring for Darren, taking him to medical providers and helping him through school. I award Denise $150,000 and Darren Sr. $75,000 for loss of consortium while Darren was a minor.

## III.   Conclusion

Darren is a bright young man who faced a difficult set-back in his life. His life may not follow his original plan, but with the appropriate care and treatment, it should be a happy and fulfilling one. That is the purpose of the compensatory tort system. Many of the people around Darren—and the Court concurs—believe that he has the capacity to succeed in the future.

The total damage Darren Jr. suffered is $1,272,752. Reduced by his contributory negligence of 20%, his damage award is $1,018,201.60.

Judgment shall enter in favor of Darren Jr. in the amount of $1,018,201.60, in favor of Denise in the amount of $150,000, and in favor of Darren Sr. in the amount of $75,000.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge